IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

TONYA STOLTZ,

     Petitioner,

v.                                                                    Case No. 1:16-cv-01237-JDB-dkv

UNITED STATES OF AMERICA,

     Respondent.


ORDER DENYING MOTIONS,
DENYING § 2255 PETITION,
DENYING CERTIFICATE OF APPEALABILITY,
AND
DENYING LEAVE TO APPEAL *IN FORMA PAUPERIS*

     Petitioner, Tonya Stoltz, has filed a motion to vacate, set aside, or correct her sentence (the "Petition"), pursuant to 28 U.S.C. § 2255. (Docket Entry ("D.E.") 1.) For the reasons that follow, the Petition is DENIED.

BACKGROUND

     The following background summary is taken from the record in this case and in Stoltz's underlying criminal case, *United States v. Stoltz*, No. 1:15-cr-10013-JDB-1 (W.D. Tenn.) ("No. 1:15-cr-10013-JDB-1").[1]

*Arrest and Preliminary Proceedings*

     "On December 3, 2014, [local law enforcement] investigators . . . assisted Tennessee Department of Corrections (TDOC) probation officers with a home check at" Stoltz's home in Medina, Tennessee. (Presentence Report (the "PSR") at ¶ 7.)[2] "When [they] arrived to conduct

---

[1] Unless otherwise noted, record citations are to the instant case.

[2] All quotations from the PSR are altered to eliminate bolded lettering.

the home check, Stoltz was present with" a male individual.  (*Id.* at ¶ 10.)  "Stoltz answered the front door of the residence with two purses on her person," which contained "a glass smoke pipe, a digital scale, a plastic snort tube, a decorative container containing approximately 2.8 grams of methamphetamine/ice, a metal container that contained small individual baggies, and a plastic smoke pipe."  (*Id.* at ¶ 7.)  "A search of the residence revealed" several additional items of drug paraphernalia, as well as "two photo copies of one hundred dollar bills[,] . . . a counterfeit ten dollar bill," one pound of synthetic marijuana, "two loose pseudoephedrine pills[,] . . . a pill bottle containing . . . marijuana seeds[,] and a burnt aluminum foil strip with [methamphetamine] residue . . . ."  (*Id.* at ¶ 8.)  Also "recovered [was] a small Playmate red and white cooler on a storage shelf above the dryer that contained various components used in the manufacturing of methamphetamine."  (*Id.* at ¶ 9.)

"Stoltz denied knowledge of the illegal narcotics, drug paraphernalia, counterfeit money, and the cooler . . . ."  (*Id.* at ¶ 11.)  Both Stoltz and the male individual were "transported to the Criminal Justice Complex and charged accordingly."  (*Id.*)

"On December 18, 2014, investigators with the West Tennessee Judicial Violent Crime and Drug Task Force utilized a confidential informant (CI) to arrange a delivery of one gram of methamphetamine (in ice form) from Stoltz to the CI in the parking lot of Walgreen's in Milan, Tennessee."  (*Id.* at ¶ 12.)  Stoltz was found with "a plastic baggy that contained . . . one gram of methamphetamine."  (*Id.*)  "A search of [her] vehicle revealed another bag of crystal methamphetamine[,] a plastic bag" containing synthetic marijuana, and drug paraphernalia, including "a set of weighing scales."  (*Id.*)

On February 20, 2015, state and federal law enforcement officers interviewed Petitioner (the "February 2015 meeting") at the offices of the 28th West Tennessee Drug Task Force (the

"28 DTF").  (*Id.* at ¶ 13.)  Law enforcement officers who attended the meeting included Chad Jackson and David Blurton from 28 DTF, and agents Charles Stewart and Mike Woodham from the federal Drug Enforcement Agency (the "DEA").  (No. 1:15-cr-10013-JDB-1, D.E. 2-1 at PageID 13; No. 1:15-cr-10013-JDB-1, D.E. 80 at PageID 277.)

The purpose of the meeting was for Petitioner to assist law enforcement by providing information about the criminal activities of other individuals.  (*Id.*, D.E. 80 at PageID 276, 282, 307-08.)  During the meeting, Stoltz provided such information and, according to Agent Stewart's criminal complaint affidavit, also "stated that, in . . . 2014, she purchased one pound of crystal methamphetamine from" Individual 1, and that she had, "about ten times," purchased "anywhere from one to two ounces [of methamphetamine] at a time" from Individual 2 in 2014.[3]  (*Id.*, D.E. 2-1 at PageID 13, 14.)

On March 2, 2015, Stewart received information from state Investigator Christi Foster that an informant had told her that Stoltz, who was on probation at the time, recently travelled to northern Mississippi to buy drugs.  (*Id.*, D.E. 80 at PageID 309-10.)  A criminal complaint against Stoltz was filed in federal court.  (*Id.*, D.E. 80 at PageID 311; *id.*, D.E. 1.)  In the affidavit supporting the complaint, Stewart recited the inculpatory information revealed by Stoltz at the February 2015 meeting with law enforcement officers.  (*Id.*, D.E. 2-1 at PageID 12-14.)  An arrest warrant was issued.  (*Id.*, D.E. 3.)

The next day, March 3, 2015, a state probation officer went to Stoltz's house for a home check.  (PSR at ¶ 17.)  Petitioner "was on active probation" at the time, and was "the sole occupant of the residence."  (*Id.*)  The probation officer was assisted by state law enforcement officers, and

---

[3] All quotations from Stewart's affidavit are altered to eliminate bolded lettering and irregular capitalization.

by federal agents, including Stewart. (*Id.*) The officers recovered "three separate bags of methamphetamine: one bag containing approximately 2.0 grams of methamphetamine/ice, one bag containing 1.2 grams of methamphetamine powder, and one bag containing approximately 3.7 grams of methamphetamine/ice." (*Id.*) "The total amount was approximately 6.9 grams of methamphetamine." (*Id.*) Also discovered were "a glass smoke pipe[,] . . . two alprazolam pills, fifty four Meloxicam pills, a marijuana blunt[,] approximately 1.6 grams of marijuana, digital scales with residue, and miscellaneous clear plastic baggies." (*Id.*) Petitioner was arrested. (*Id.* at ¶ 18.)

On March 4, 2015, Stoltz appeared before Magistrate Judge Edward G. Bryant, and an attorney was appointed to represent her.[4] (No. 1:15-cr-10013-JDB-1, D.E. 4.) Through counsel, Defendant "waived [her] right to a detention hearing, but requested a probable cause hearing." (*Id.*, D.E. 10.) Magistrate Judge Bryant held a probable cause hearing on March 10, 2015, at which Stewart and state probation officer Eugene Wardfin testified. (*Id.*) "No witness [was] presented by the [Defendant]." (*Id.*) The magistrate judge found that probable cause existed for the March 3, 2015, arrest. (*Id.*) He also "bound the case over to further action of the grand jury," and remanded the Defendant to the custody of the United States Marshal. (*Id.*) On March 23, 2015, the grand jury returned a one-count indictment alleging that, "[b]eginning at . . . least as early as in or about March 2014, until on or after March 3, 2015," Stoltz distributed and possessed with intent to distribute "a Schedule II controlled substance, . . . in violation of Title 21, U.S.C. § 841(a)(1)." (*Id.*, D.E. 15 at PageID 31.)

---

[4] Jon A. York was Petitioner's first attorney. (*See* 1:15-cr-10013-JDB-1, D.E. 4.) In 2018, Attorney York was appointed as a magistrate judge with this Court. He has recused himself from this case. (*See* D.E. 79.)

On April 23, 2015, Stoltz's attorney was granted permission to withdraw his representation (*id.*, D.E. 21), and new counsel was appointed (*id.*, D.E. 22.) New counsel's motion to withdraw his representation was granted on May 7, 2015 (*id.*, D.E. 25), and attorney Robert Thomas[5] was appointed (*id.*, D.E. 27).

*Guilty Plea*

According to counsel, he first met with Petitioner on or about May 19, 2015. (DE. 27-1 at PageID 375.) At the meeting, he "learned that [she] was in the process of assisting law enforcement by providing information with regard to criminal activity that may [have been] ongoing in the West Tennessee area." (*Id.*) He was also told that she "was . . . helping the Madison and Gibson County Sheriffs' Departments with two cold case homicides." (*Id.*) Counsel and Stoltz then "met with law enforcement on at least four (4) occasions to discuss information that [she] had obtained in furtherance of this assistance." (*Id.*) She "also had at least one meeting with the U.S. Marshals without counsel present." (*Id.*) Throughout "the course of [counsel's] representation," Petitioner "maintain[ed] . . . that she did not make the statement attributed to her" from the February 2015 meeting and "contained in the DEA Report of Investigation that was included in the discovery files." (*Id.*)

"Given the level of . . . Stoltz's cooperation with law enforcement," counsel

discussed with [his client] on several occasions the decision as to whether she should contest the admissibility of the statement given [at the February 2015 meeting] or continue assisting law enforcement. Said discussions lasted well into the representation, which [was] evidenced by the filing of a Motion for Additional Time to File Pretrial Motions on . . . Stoltz's behalf on September 27, 2015. After finally weighing her options, . . . Stoltz decided to rely on her assistance rather than challenging the statement in hopes of receiving a lesser sentence.

(*Id.* at PageID 375-76.)

---

<sup>5</sup>  All references to "counsel" in this order are to Attorney Thomas.

On October 14, 2015, Petitioner, with the assistance of counsel, entered into a plea agreement with the Government. (No. 1:15-cr-10013-JDB-1, D.E. 54.) The agreement provided, in pertinent part, as follows:

> The defendant agrees to plead guilty to Count 1 of the Indictment in the above-styled cause.
>
> ***
>
> The Government agrees not to object to a recommendation by the probation office or a ruling of the court which awards the defendant an appropriate-level decrease in the base offense level for acceptance of responsibility. If the offense level in the Presentence Report is 16 or greater and the court accepts a recommendation in the Presentence Report that defendant receive two points for acceptance of responsibility, the United States agrees to move for an additional one-point reduction for acceptance of responsibility for a total of three points.
>
> ***
>
> The Government agrees to advise the probation office and the court of the extent and nature of the defendant's cooperation. The defendant's agreement to cooperate with the government is made pursuant to U.S.S.G. 1B1.8(a) & (b). If the defendant provides full, complete, truthful, and substantial cooperation to the government, the government reserving the right to make the decision on the nature and extent of the defendant's cooperation, then the Government agrees to consider moving for a downward departure under U.S.S.G. § 5K1.1, 18 U.S.C. § 3553(e), or Rule 35 of the Federal Rules of Criminal Procedure. Both parties acknowledge that the district court has the power to deny a motion for downward departure. The defendant hereby agrees that the government does not promise, by the terms of this agreement, to file a Section 5K1.1, 18 U.SC. § 3553(e) or Rule 35 motion. [6]

(*Id.*, D.E. 54 at PageID 126-29).)

_____

[6] Eighteen U.S.C. § 3553(e) states that, "[u]pon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." 18 U.S.C. § 3553(e). Rule 35(b) provides that, "[u]pon the government's motion made within one year of sentencing, the court may reduce a sentence if the defendant, after sentencing, provided substantial assistance in investigating or prosecuting another person." Fed. R. Crim. P. 35(b). Section 5K 1.1 allows the court to "depart from the [G]uidelines" "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." U.S.S.G. § 5K1.1.

The section titled "PLEA AGREEMENT CONSTITUTES ENTIRE AGREEMENT" provided as follows:

> There are no other agreements between and among the parties to this agreement. The defendant is satisfied that all acts and/or any omissions of counsel for the defense have been the result of reasonable professional judgment and that defendant has been provided adequate legal representation in this case. The defendant enters this agreement freely, knowingly, and voluntarily, and upon the advice of counsel.

(*Id.*, D.E. 54 at PageID 129 (bolding omitted).).

The Court held a change of plea hearing on October 14, 2015. (*Id.*, D.E. 79.) At the start of the hearing, the Court advised the Defendant that she should let the Court or her attorney know if there is anything that she did not understand, and she stated that she would do so. (*Id.*, D.E. 79 at PageID 228.) She answered "Yes, sir" when asked whether she had had "sufficient opportunity to discuss th[e] matter with [her] attorney." (*Id.*, D.E. 79 at PageID 229-30.) When asked if she was "satisfied with [her attorney's] advice and representation," she replied "He's a good lawyer, yes, sir." (*Id.*, D.E. 79 at PageID 230.)

The Court advised Stoltz of the trial and appellate rights she was giving up and the potential penalties for the crime she was pleading guilty to, and she stated that she understood. (*Id.*, D.E. 79 at PageID 231-34.) The Court reiterated that she "w[ould] be giving up th[e] right to appeal that conviction if [she] d[id] plead guilty," and asked her if she understood. (*Id.*, D.E. 79 at PageID 234.) She answered "Yes, sir." (*Id.*, D.E. 79 at PageID 234.)

The Court inquired whether the Defendant had "had a chance to read [the indictment] over and [to] discuss it with Mr. Thomas," and the Defendant stated she had. (*Id.*, D.E. 79 at PageID 235.) The Court read the sole count of the indictment in its entirety in open court, and Stoltz affirmed that she understood the charge. (*Id.*, D.E. 79 at PageID 235.) The Court explained the "maximum . . . potential penalty," and, after conferring with counsel, the Defendant stated that she

understood.  (*Id.*, D.E. 79 at PageID 236.)  Stoltz denied that "anyone threatened [her] or tried to force [her] to plead guilty to the charge."  (*Id.*, D.E. 79 at PageID 237.)  She affirmed that the signature on the plea agreement was hers, and that she had "signed that document following [her] review of it with [her] attorney freely and voluntarily."  (*Id.*, D.E. 79 at PageID 238.)  The Government's attorney summarized the plea agreement, including the appeal waiver provision. (*Id.*, D.E. 79 at PageID 238-40.)  The Court asked the Defendant if she understood and agreed to the terms of the plea agreement, and she answered "Yes, sir."  (*Id.*, D.E. 79 at PageID 240-41.)

Stoltz affirmed that she and her attorney had "discuss[ed] . . . the application of what is called the United States Sentencing Guidelines."  (*Id.*, D.E. 79 at PageID 241-42.)  The Court informed her that the Guidelines are "no longer mandatory," but that the Court was "still directed to consider them, along with other factors . . . in determining what an appropriate sentence might be in [her] case."  (*Id.*, D.E. 79 at PageID 242.)  When she was advised that her "sentence could be reduced . . . if the government was to make a motion under Section 5K1.1 of the sentencing [G]uidelines, sometimes referred to as the substantial assistance motion," the following exchange occurred:

> THE COURT: Now it is solely up to the government to decide whether or not to make that motion.
>
> Do you understand that, ma'am?
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  Solely up to them.  I don't have any—I don't have any involvement in whether or not the government makes that motion.
>
> Now if the government did make that motion, then it will be up to me to decide, first of all, whether to grant the motion.  And then secondly, to what extent, if any, to reduce your sentence based upon that assistance.
>
> Do you understand that, ma'am?

THE DEFENDANT:  May I ask a question?

THE COURT:  Sure.

THE DEFENDANT:  When does that happen?

THE COURT:  It generally will probably happen at the time of sentencing.

THE DEFENDANT:  Okay.  So that's when they put the motion in?

THE COURT:  If they are going to do it that's generally when it happens.  But that it—there is no guarantee they're going to do that.  Okay?  They have to make that decision.  I don't make that decision about whether they make that motion.

THE DEFENDANT:  Okay.

THE COURT:  If they don't make the motion then there is nothing I can do about that.

THE DEFENDANT:  It doesn't get considered then at all?

THE COURT:  No, ma'am.  If they don't make the motion then I can't consider it.

THE DEFENDANT:  Okay.

THE COURT:  Do you follow me?

THE DEFENDANT:  Yes, sir.

(*Id.*, D.E. 79 at PageID 244-45.)

The Court then reviewed the three circumstances in which her appeal waiver would not apply: "if the Court was to sentence [her] above the statutory maximum," if the sentence imposed "went above [the Guidelines] range," and "if the government itself appealed [the] sentence."  (*Id.*, D.E. 79 at PageID 246.)  The Defendant stated that she understood, and that she was freely waiving her appeal rights.  (*Id.*, D.E. 79 at PageID 246-47.)  When asked, "[O]ther than conversations you may have had with your attorney, Mr. Thomas, about how the advisory [G]uidelines might apply to your case, has anyone else made any type of promise or prediction to you about what your

sentence would be if you plead guilty to this charge?" Stoltz stated that she did not understand the

question.  (*Id.*, D.E. 79 at PageID 248.)  The Court clarified:

> THE COURT: Okay.  So what I don't want you doing is I don't want you pleading guilty to this charge because somebody, whether it be somebody in law enforcement or anyone says I promise you you're not going to get this sentence if you plead.  Okay.  Nobody had done that, have they?
>
> THE DEFENDANT:  No, sir.

(*Id.*, D.E. 79 at PageID 248).

The Government's attorney then summarized the proof that would have been presented at

trial.  (*Id.*, D.E. 79 at PageID 248-50.)  Stoltz confirmed that the government's "statement [was]

correct."  (*Id.*, D.E. 79 at PageID 250.)  Finding that "there [was] an independent basis in fact for

[the] plea," the Court asked the Defendant if she was "pleading guilty to that count because [she

was], in fact, guilty of that offense?"  (*Id.*, D.E. 79 at PageID 250-51.)  The following exchange

was had:

> THE DEFENDANT:  Am I pleading guilty because I'm—
>
> THE COURT:  You are guilty of the offense of unlawfully, intentionally possessing with intent to distribute, and distribution of a mixture and substance containing a detectable amount of methamphetamine.
>
> Are you pleading guilty to that count, ma'am?
>
> THE DEFENDANT:  Am I pleading guilty to that count?  Yes, sir.
>
> THE COURT:  You are?
>
> THE DEFENDANT:  Yes, sir.

(*Id.*, D.E. 79 at PageID 251.)  The Court found that Stoltz was "freely and voluntarily pleading

guilty to Count 1." (*Id.*, D.E. 79 at PageID 251.)  Before adjourning, the Court asked the Defendant

"[d]o you have any other questions about what the Court has been over with you this morning?"

(*Id.*, D.E. 79 at PageID 252.)  Stoltz answered "No, sir."  (*Id.*, D.E. 79 at PageID 253.)

*Sentencing*

The United States Probation Office ("USPO") calculated the Defendant's advisory sentencing range under the 2015 United States Sentencing Commission Guidelines Manual (the "Guidelines" or "U.S.S.G.").[7] The Defendant was assigned an adjusted offense level of 30. (PSR at ¶ 29.) A two-level reduction was applied for "[t]he defendant['s] . . . demonstrated acceptance of responsibility for the offense" under U.S.S.G. § 3E1.1(a). (*Id.* at ¶ 31.) The USPO applied an additional one-level reduction for her assistance to "authorities in the investigation or prosecution of [her] own misconduct by timely notifying authorities of the intention to enter a plea of guilty." (*Id.* at ¶ 32.) "Based upon a total offense level of 27 and a criminal history category of V, the [G]uideline imprisonment range" was determined to be "120 months to 150 months." (*Id.* at ¶ 106.)

On December 31, 2015, counsel filed twenty-two objections to the PSR. (No. 1:15-cr-10013-JDB-1, D.E. 59.) He filed a sentencing memorandum on February 12, 2016, reasserting the objections and discussing the sentencing factors under 18 U.S.C. § 3553(a). (*Id.*, D.E. 68 at PageID 155-65.) As to the drug quantities attributed to the Defendant, counsel argued, among other things, that the 6.9 grams of methamphetamine discovered at her residence at the time of her arrest should not be counted. (*Id.*, D.E. 68 at PageID 156.) He maintained that "Ms. Stoltz submits that [those] drug quantities . . . were in her possession with the knowledge of law enforcement and

---

[7] Unless otherwise noted, all references to the Guidelines are to the Guidelines in effect on the date of the Defendant's sentencing. *See* United States Sentencing Commission, *Guidelines Manual* (eff. Nov. 1, 2015).

she was scheduled to turn over said substance(s) to law enforcement on March 3, 2015, when she was arrested in the instant matter." (*Id.*, D.E. 68 at PageID 156.) Counsel also argued that the Court should take into consideration, under 18 U.S.C. § 3553(a), the Defendant's "decision to assist local authorities in stopping the illegal drug trafficking and other criminal activity," and also the fact that she "was so honest, that she actually incriminated herself during the [February 2015] meeting in an attempt to prove her worthiness and the veracity of the information that she was providing to the agents." (*Id.*, D.E. 68 at PageID 158, 159.)

"Prior to the beginning of the sentencing hearing," which was held on March 4, 2016, the government offered to recommend a sentence of 85 months incarceration." (27-1 at PageID 376.) Counsel "communicated [the offer] to . . . Stoltz," but she "rejected" it. (*Id.*)

Counsel called three witnesses at the sentencing hearing to support his argument that the Defendant had provided substantial assistance to the Government. (No. 1:15-cr-10013-JDB-1, D.E. 80 at PageID 274-300.) The witnesses were also called in support of his argument that the 6.9 grams of methamphetamine found at her residence at the time of her March 2015 arrest should not be counted toward the calculation of her offense level because the drug was in her possession at the direction of law enforcement. (*Id.*, D.E. 28 at PageID 156.)

David Blurton, an investigator with the 28 DTF, testified that in December 2014, he "had set up a [drug] buy from" the Defendant. (*Id.*, D.E. 80 at PageID 275.) After "she was stopped and [was found to have] the methamphetamine on her," she was arrested. (*Id.*, D.E. 80 at PageID 275.) Blurton further testified that he had attended the February 2015 meeting. (*Id.*, D.E. 80 at PageID 275-76.) He explained that "[i]n [his] understanding . . . she would be used as a[n] informant." (*Id.*, D.E. 80 at PageID 276.) He confirmed, however, that she was never "used to make any kind of purchases or buys," and that "the information that she provided [did not] lead to

any investigations or arrests." (*Id.* D.E. 80 at PageID 277.) On cross-examination, the witness was asked "did you ever authorize the defendant to possess a quarter ounce of methamphetamine on a later March date down in Madison County?" (*Id.*, D.E. 80 at PageID 278.) He answered "No, sir. No, sir, we never." (*Id.*, D.E. 80 at PageID 278.)

Agent Chad Jackson from the 28 DTF testified as to the controlled buy of methamphetamine from Stoltz in December 2014. (*Id.*, D.E. 80 at PageID 280.) He stated that he "interviewed her in the Gibson County Jail shortly after" her arrest to discuss "some information she had on a cold case homicide." (*Id.*, D.E. 80 at PageID 281.) He further testified that he attended the February 2015 meeting. (*Id.*, D.E. 80 at PageID 281.) He stated that the Defendant provided information about individuals involved in drug activity in the area, some of which he was later able to verify. (*Id.*, D.E. 80 at PageID 281-83.) He explained that "she was working for us," and "there [were] statements made . . . of a possibility of maybe trying to purchase some methamphetamine." (*Id.*, D.E. 80 at PageID 285.) He confirmed that "during the [February 2015] meeting [there] were . . . statements made by Ms. Stoltz with regards to her own criminal activity." (*Id.*, D.E. 80 at PageID 284.) He explained that, over the course of the next month, he and Stoltz "would text" about criminal activity that was taking place, and that he passed some of the information on to other law enforcement officers. (*Id.*, D.E. 80 at PageID 284.)

Jackson recalled seeing a text "supposed[ly] . . . from . . . [Agent] Stewart," in which Stewart told the Defendant that he "would like [her] to purchase methamphetamine for us," and Stoltz's reply that she "was not going to do anything without speaking to Chad." (*Id.*, D.E. 80 at PageID 285-86.) Jackson further testified that Stewart replied "well, you implemented [sic]

yourself in a pound of dope. You will work, you will work for us or I will go to the U.S. Attorney General." [8] (*Id.*, D.E. 80 at PageID 286.)

Jackson confirmed that "[u]p until her arrest [it] was . . . [his] intention to use [the Defendant] as a confidential informant." (*Id.*, D.E. 80 at PageID 287.) He was asked whether he was "aware [that] she had" 6.9 grams of "methamphetamine, marijuana, [and] digital scales with residue" in her possession at the time of her March 2015 arrest, to which he replied "Absolutely not." (*Id.*, D.E. 80 at PageID 287.) When asked "Did you ever receive any information that Ms. Stoltz was making purchases or buys without drug force knowledge?" he answered "I didn't, no." (*Id.*, D.E. 80 at PageID 287.) He also answered in the negative to the question whether, "at any time prior to her arrest did Ms. Stoltz ever indicate to you that [Individual 2] had given her a sample with regards to illegal substances?" (*Id.*, D.E. 80 at PageID 288.) When asked, "So to make sure we are clear . . . [t]he 7 grams of methamphetamine that were found in her possession, you had no knowledge that she possessed that?" he answered "I did not. To this date I don't know where it came from." (*Id.*, D.E. 80 at PageID 288.)

Sergeant TJ King with the Madison County Sheriff's Department testified that the Defendant had provided information on a cold case homicide. (*Id.*, D.E. 80 at PageID 290-91.) He explained that she also "provided approximately 90 names and/or nicknames of criminals involving drug activity, illegal behavior, illicit behavior, et cetera." (*Id.*, D.E. 80 at PageID 294.) King "passed on" some of that information "to other law enforcement agencies." (*Id.*, D.E. 80 at PageID 294.) He expressed that her assistance "[p]otentially" placed her at risk of harm. (*Id.*,

---

[8] Stewart's actual text, which was produced in discovery, read: "If you're not aware you have charge[s] pending and you [on] your own free will you confessed to a federal drug crime the other day. So good luck I will let you know what the U.S. Attorney says." (D.E. 2-4 at PageID 129.)

D.E. 80 at PageID 286.) On cross-examination, King stated that of "[t]he 90 names that she provided . . . [i]n the multiple meetings," "none that [he was] aware of" resulted in "successful arrests and prosecutions." (*Id.*, D.E. 80 at PageID 299.)

The Government's attorney called Stewart to testify about the Defendant's cooperation and to the events leading up to her arrest in March 2015. According to the agent, he participated in the February 2015 meeting because he "felt [that Stoltz] would be very helpful in" assisting his agency in "two active cases." (*Id.*, D.E. 80 at PageID 308.) He explained, however, that she did not end up providing assistance. (*Id.*, D.E. 80 at PageID 308.) He also testified that Investigator Christi Foster from the Madison County Sheriff's Department "contacted [him] on March 2nd" to tell him that an informant had revealed to her that "Stoltz, who was on probation, had went [sic] into Mississippi to purchase some illegal narcotics and was, would be coming back." (*Id.*, D.E. 80 at PageID 309-10). He explained that "the following day[,] we had a probation officer come in. We went to [Stoltz's] house with the Federal arrest warrant with the probation officer and found the 6.9 grams of methamphetamine." (*Id.*, D.E. 80 at PageID 310.) Stewart confirmed that "prior to [the arrest he] had sent her a message telling her that she had incriminated herself during t[he] meeting on February 20th" because he "was trying to get her to cooperate." (*Id.*, D.E. 80 at PageID 311.)

Counsel cross-examined Stewart about the statements from the February 2015 meeting:

Q. Agent, so was the—were you [at Stoltz's home on March 3rd] because of the information from Investigator Foster or were you there because of the statement that [Stoltz] made on February 20th?

A. We had did [sic] the complaint the same date and we went to arrest her the same date. But we knew she had left the state of Tennessee through the informant and was coming back.

Q. Okay. So did her statement from February 20th have anything, any kind of bearing on her arrest?

A. We were using that in the complaint, to get the complaint on her, yes, sir.

(*Id.*, D.E. 80 at PageID 310-11.)

The Government's attorney recommended a one-level reduction, under U.S.S.G. § 5K1.1, for the Defendant's cooperation in providing information that was used in surveillance applications. (*Id.*, D.E. 80 at PageID 302.) The recommendation would have resulted in a 110- to 137-month Guidelines range. (D.E. 27 at PageID 371.) The prosecutor argued that the Defendant's assistance was not substantial in any other respect since it did not lead to any arrests, despite the volume of names and information given to law enforcement. (No. 1:15-cr-10013-JDB-1, D.E. 80 at PageID 321.) He also pointed out that the Defendant eventually "remov[ed] herself from assisting law enforcement" and that "she had all these demands before she would help." (*Id.*, D.E. 80 at PageID 319.) He stated that, should the information she provided in the homicide case eventually lead to arrests or prosecutions, "potentially there is a Rule 35 situation." (*Id.*, D.E. 80 at PageID 321.)

Counsel argued that his client's cooperation justified a five to ten level reduction in her offense level, and was otherwise a § 3553 consideration warranting a significant downward departure. (*Id.*, D.E. 80 at PageID 313-321.) He noted that her substantial assistance was reflected, "not only [by] the sheer volume of information that she[] g[ave]" to law enforcement about criminal drug activity in the region, but also by her assistance with a cold case "homicide investigation, and [her having] expos[ed] herself to . . . risk of harm . . . with regard to th[at] investigation." (*Id.*, D.E. 80 at PageID 320.) He also argued that her good faith efforts to assist law enforcement led to her arrest, insisting that "[h]ad [the Defendant] not talked to [law enforcement] voluntarily, there is a good change we would not be here today." (*Id.*, D.E. 80 at PageID 313.)

The Court found that "there h[ad] been no prosecutions [or] arrests" as a result of the Defendant's assistance. (*Id.*, D.E. 80 at PageID 315.) The Court was also not persuaded that the federal case against Stoltz rested solely on the inculpatory statements she made during the course of providing information to law enforcement at the February 2015 meeting:

> Court: Well, but didn't Ms. Foster apparently advise [federal agents] that, through confidential information that your client was coming back from Mississippi having bought [the 6.9 grams of] th[e] narcotic?"
>
> Thomas: "I know that's been the testimony that's been presented, but that is—we dispute that, but we understand that's the testimony given."

(*Id.*, D.E. 80 at PageID 313.)

At the conclusion of the parties' arguments, the Court allowed the defendant an opportunity "to say anything [she] wish[ed]." (*Id.*, D.E. 80 at PageID 322.) Stoltz read from a written statement for approximately ten minutes. (Id., D.E. 80 at PageID 322-23.) After thanking friends and family for their support, she stated that she "want[ed] to thank Mr. Thomas. You're an excellent attorney." (*Id.*, D.E. 80 at PageID 331.)

The Court accepted the plea agreement and found that Stoltz's waiver of her appeal rights "was knowingly and voluntarily made." (*Id.*, D.E. 80 at PageID 342.) Upon consideration of the entire record, the advisory Guidelines range, the parties' arguments, the defendant's statement, and the factors set forth under 18 U.S.C. § 3553(a), the Court imposed a sentence of ninety-months' incarceration, "to be served concurrently with sentences imposed in Humboldt Law Court, . . . Henderson County General Sessions Court, . . . Madison County Circuit Court, . . . and Hardeman County General Sessions Court." (*Id.*, D.E. 73.) Three years of supervised release was ordered. (*Id.*, D.E. 73.) The sentence represented a thirty-month downward departure from bottom of the PSR's calculated range of 120 to 150 months, and was twenty months below the bottom of the Government's recommended range of 110 to 137 months. No direct appeal was taken.

On August 29, 2016, Stoltz timely filed her Petition, together with a document titled "Declaration of Facts," (D.E. 1-1), a supporting memorandum (D.E. 1-2), and forty-five exhibits (D.E. 2; D.E. 2-1 to D.E. 2-44). The exhibits include her affidavit. (D.E. 2-5 at PageID 61-62.) She asserts that counsel rendered ineffective assistance by failing to file a motion to suppress the inculpatory statements from the February 2015 meeting, or challenge the statements as false (Claim 1), representing her while he had a conflict of interest (Claim 2), failing to properly advocate for her at sentencing (Claims 3 and 4), and failing to consult with her about an appeal (Claim 5).[9] (D.E. 1 at PageID 4-13.) On July 7, 2017, Respondent filed its Amended Answer (D.E. 27) and an affidavit from counsel (D.E. 27-1). Petitioner thereafter filed her Amended Reply (D.E. 28) with exhibits (D.E. 28-1), as well as a "Pro Se Motion to Expedite" (D.E. 29). Upon review of the parties' briefs and the exhibits, the Court ordered a limited expansion of the record relating to Claim 5. (D.E. 36.) In response, Petitioner filed, among other things, an affidavit from her father, Travis Smith, describing his efforts to contact counsel in the days after sentencing. (D.E. 41-3.)

The Court reviewed the additional materials and found that an evidentiary hearing was warranted. (D.E. 43.) The matter was referred matter to the magistrate judge for possible appointment of counsel. (*Id.* at PageID 475.) On March 13, 2018, the Court appointed an attorney to represent Petitioner. (D.E. 46.) A hearing date of May 30, 2018, was set (D.E. 48), but was extended several times upon the request of the parties (D.E. 51, D.E. 54, 58.) On August 10, 2018,

---

[9] For clarity, Ground Three of the Petition is renumbered as Claims 3 and 4, and Ground Four is now Claim 5. The Court has endeavored to liberally construe Petitioner's *pro se* submissions, which are voluminous and, at times, confusing. The evidentiary hearing in this case (the "§ 2255 hearing") has, however, served to clarify and narrow some of the *pro se* allegations.

Petitioner filed, *pro se*, copies of an email exchange she had with appointed counsel regarding discovery materials she wished for him to obtain. (D.E. 57.) The Court entered an order on August 16, 2018, advising the inmate that she "may *only* submit documents to the Court by and through her duly-appointed counsel." (D.E. 59 at PageID 504 (emphasis in original).) She was "ordered to refrain from mailing any further items to this Court so long as she is represented by counsel." (*Id.* (capitalization omitted).) Three weeks later, she filed with the Court a copy of a September 4, 2018, letter she had sent to counsel demanding that he prepare subpoenas for "a verbatim account" of a December 2014 interview she gave to state law enforcement officers. (D.E. 61.)

The evidentiary hearing date was reset at the Court's own direction (D.E. 62), and, later, upon the parties' motions (D.E. 64, D.E. 67.) The hearing was held on February 27, 2019. (D.E. 71.) The parties presented evidence and argument regarding the voluntariness of the guilty plea and the circumstances surrounding counsel's failure to consult with Petitioner about an appeal. (D.E. 77.) Discussion was also had regarding the availability of certain law enforcement interview tapes. (*Id.* at PageID 545-48.)

Upon consideration of the record in the underlying criminal case, the documents submitted in this case, and the evidence adduced at the evidentiary hearing, the Court finds that Claim 1 is a non-cognizable pre-plea claim, and that all of the claims are without merit. The Court will first address Claim 5, and then the remaining claims in numeric order.[10]

---

[10] After entry of the Court's record-expansion order, Petitioner filed a document titled "Motion to Correct Discrepancy in Court's Order For Limited Expansion." (D.E. 40.) In the motion, Petitioner points out that the record-expansion order stated that the Petition asserts the ineffective assistance of counsel regarding her statements at the February 2015. (*Id.* at PageID 453.) She asks the Court to modify the expansion order to reflect that she has alleged that the statements were falsely attributed to her. (*Id.*) The Court does understand that Petitioner has so alleged. Accordingly, there is no need to modify the expansion order. The Motion is therefore DENIED.

Petitioner's *pro se* motion for an expedited ruling (D.E. 29), is DENIED as moot.

I.       Claim 5: Counsel's Failure to Consult With Petitioner About an Appeal

Petitioner asserts that counsel provided ineffective assistance by failing to consult with her about an appeal after the sentence was imposed. (D.E. 1 a PageID 13.) The claim is without merit.

A claim that an attorney's ineffective assistance has deprived a criminal defendant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on such a claim, a petitioner must demonstrate two elements: (1) "that counsel's performance was deficient"; and (2) "that the deficient performance prejudiced the defense." *Id.* at 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must apply "a strong presumption" that the attorney's representation was "within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks and citation omitted). An attorney's "strategic choices" are "virtually unchallengeable" if based on a "thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

To demonstrate prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the

outcome." *Id.* "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 693) (citations omitted). Instead, "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687).

In *Roe v. Flores-Ortega*, the United States Supreme Court announced that *Strickland*'s test applied to claims "that counsel was constitutionally ineffective for failing to file a notice of appeal." 528 U.S. 470, 477 (2000). The Court held that a criminal attorney who fails to file a timely notice of appeal after a request by his client performs deficiently. *Id.* Moreover, prejudice is presumed and the defendant need not show that "'h[er] appeal would likely have had merit.'" *Id.* (quoting *Peguero v. United States*, 526 U.S. 23, 28 (1999)). The Court in *Flores-Ortega* also extended *Strickland* to cases where "the defendant did not clearly express h[er] wishes one way or the other as to whether [s]he wanted to file an appeal." *United States v. Lovell*, 83 F. App'x 754, 758–59 (6th Cir. 2003) (citing *Flores-Ortega*, 528 U.S. at 477). In such a circumstance, counsel renders ineffective assistance where he had a duty to consult with the defendant about an appeal but did not did so, and the failure prejudiced the defendant. *Flores-Ortega*, 428 U.S. at 480-81).

In addressing a failure-to-consult claim, a court must first determine whether counsel "'consulted with the defendant about an appeal.'" *Lovell*, 83 F. App'x at 758 (quoting *Flores-Ortega*, 428 U.S. at 478). "Consult" means "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." *Flores-Ortega*, 528 U.S. at 478.

In the present case, the parties do not dispute that counsel did not consult with Petitioner about an appeal after the sentence was imposed. The question before the Court is therefore whether

counsel "had an absolute duty to consult." *Lovell*, 83 F. App'x at 758. Such a duty "exists only where (1) a rational defendant would want to appeal, because of, for example, the existence of non-frivolous grounds for appeal, or (2) the defendant in question reasonably demonstrated to counsel that [s]he was interested in appealing." *Id.* Counsel's "[f]ailure to consult in those circumstances constitutes deficient performance." *Id.*

To determine whether a rational defendant would have wanted to appeal, or whether the defendant reasonably expressed to counsel an interest in appealing, a court must take numerous factors into account, including whether the defendant pleaded guilty and whether she waived her appeal rights:

> Although not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights. Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal.

*Flores*-Ortega, 528 U.S. at 480.

If the defendant demonstrates that counsel performed deficiently, "the second component that must be explored is whether [s]he was prejudiced by h[er] counsel's deficiency." *Lovell*, 83 F. App'x at 758 (citing *Flores-Ortega*, 528 U.S. at 481). The defendant can show prejudice "by putting on evidence that had counsel consulted with h[er], there is a reasonable probability that the defendant would have appealed, . . . or by pointing out the existence of non-frivolous grounds for appeal." *Id.* (citing *Flores-Ortega*, 528 U.S. at 484). Where there are no non-frivolous grounds for appeal, "evidence of some sort must be adduced to demonstrate that [the defendant] would have actually appealed had [s]he been consulted." *Id.* at 759 (citing *Flores-Ortega*, 528 U.S. at

486).  Proof that the defendant "would have" appealed "requires something more" than a mere showing that "[s]he expressed 'an interest' in appealing."

Stoltz asserts that she did not knowingly and voluntarily plead guilty or waive her appeal rights because counsel's ineffective assistance induced her to plead guilty in lieu of proceeding to trial.  (*See* D.E. 1 at PageID 4-9; D.E. 77 at PageID 548, 573, 578.)  Because *Flores-Ortega* instructs that a court must take into account the fact of a petitioner's guilty plea and appeal waiver in determining whether counsel had a duty to consult about an appeal, the Court will first address the voluntariness of Stoltz's guilty plea and appeal waiver.[11]

A.  Voluntariness of the Guilty Plea and Appeal Waiver

"A guilty plea is valid only if the defendant knowingly, intelligently and voluntarily waives the many constitutional rights associated with a criminal trial . . . and has 'sufficient awareness of the relevant circumstances and likely consequences' of the plea."  *United States v. Taylor*, 281 F. App'x 467, 469 (6th Cir. 2008) (quoting *Brady v. United States,* 397 U.S. 742, 748 (1970)) (citing *Boykin v. Alabama*, 395 U.S. 238, 243 (1969)).  "At a minimum, the defendant must understand the 'critical' or 'essential' elements of the offense to which he or she pleads guilty."  *United States*

---

[11]  The parties were advised by the Court's record-expansion order that a petitioner's guilty plea and appeal waiver are "highly relevant" to a determination of whether counsel had a duty to consult about an appeal.  (D.E. 36 at PageID 443 (quoting *Flores-Ortega*, 528 U.S. at 480).)  The parties therefore submitted proofs at the § 2255 hearing regarding the voluntariness of Petitioner's guilty plea and appeal waiver.  The allegations set forth in Petitioner's *pro se* submissions as to what failures of counsel coerced her into pleading guilty (*see e.g.*, D.E. 1 at PageID 4-9), are not entirely consistent with her § 2255 hearing testimony.  Where they are inconsistent, the Court relies on her testimony, which was given under oath and developed by experienced appointed counsel.

*v. Valdez*, 362 F.3d 903, 909 (6th Cir. 2004) (citing *Bousley v. United States*, 523 U.S. 614, 618-19 (1998)). "The satisfaction of these requirements cannot be inferred from the bare fact that the defendant pleaded guilty, because he still might not have known what he was giving up when he did so." *Ruelas v. Wolfenbarger*, 580 F.3d 403, 409 (6th Cir. 2009) (citing *Boykin*, 395 U.S. at 243).

At the § 2255 hearing, Stoltz acknowledged that she had signed the plea agreement and that her sworn testimony at the change of plea hearing was that she signed it "freely and voluntarily following [her] review of it with [her] attorney." (D.E. 77 at PageID 570.) She also conceded that she had answered "yes" at the change of plea hearing to the Court's question whether she had "had sufficient opportunity to discuss this matter . . . with [her] attorney." (*Id.* at PageID 574.) She insisted, however, that she had not understood the terms of the agreement, including her appeal waiver. In her words, counsel "had come to me right before we entered the [court]room. He slid two pieces of paper in there and he said, sign one of these. We didn't discuss a waiver. He just said for me to trust him, that this was going to get me home." (*Id.* at PageID 571.) She also stated "my lawyer told me to say [yes] to all of [the Court's] questions," "to trust him [and] to convince him . . . [a]nd I did." (*Id.* at PageID 570, 579.) She testified that she was "distraught" at the change of plea hearing "because [she] knew that what [she] was doing [she] shouldn't be doing" (*id.* at PageID 573), but that she agreed to plead guilty because counsel had "told [her] that [she] was looking at 24 to 30 months at the most" and she "could live with that." (*Id.*, at PageID 578.)

Counsel testified that he and Stoltz "met a day or so prior to the . . . change of plea hearing to review the agreement before the hearing." (*Id.* at PageID 584.) He explained that his client "was still at the Madison County Jail" at the time. (*Id.* at PageID 584-85.) He "took the agreement over" to the jail, "talked [with her] about what would happen at the change of plea hearing [and]

[a]dvised her about the appellate waiver, and the other terms of the agreement." (*Id.* at PageID 285.) They also "[t]alked about some other issues as far as other language in the agreement, as far as what was contained therein as far as promises or what have you or anything that [he] thought would happen going forward in a case." (*Id.*) He stated that his meeting with Stoltz was consistent with his "general practice." (*Id.* at PageID 585.)

Counsel further testified that "[o]n the day" of the change of plea hearing, he did not "recall any time not in open court where Ms. Stoltz was worried about her appeal rights as to her sentence." (*Id.* at PageID 586.) He affirmed that, in the "days or weeks or even months" between the change of plea hearing and the sentencing hearing, Petitioner did not "express to [him] any concern with her ability or right to appeal her sentence." (*Id.*)

Petitioner has not established that the ineffective assistance of counsel induced her to plead guilty. The Court's plea colloquy was proper and thorough, and scrupulously followed the requirements of Fed. R. Crim. P. 11. Petitioner admitted under oath that she understood the terms of the plea agreement, the "many constitutional rights" she was waiving, *Taylor*, 281 F. App'x at 469, and the key "elements of the offense to which [s]he" was pleading guilty, *Valedez*, 362 F. 3d at 909. Her sworn testimony is a "formidable barrier" to § 2255 relief. *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity.").

The inmate's explanation that she pleaded guilty to a crime she did not commit because counsel told her to say "yes" to all of the Court's questions is not credible, and therefore does not overcome her sworn testimony. The transcript of that hearing demonstrates that she asked clarifying questions several times prior to answering in the affirmative. (*See* No. 1:15-cr-10013-JDB-1, D.E. 79 at PageID 244-45, 248, 251.) Indeed, the transcript shows, and the Court recalls, that Petitioner was quite careful to understand the questions before answering them. Moreover,

the Court encouraged her to raise any questions or concerns she may have had, but she never mentioned that counsel was pushing her to admit things she did not say or do, that she did not understand what was transpiring, or that she otherwise felt that she was being coerced into pleading guilty. Her comments about counsel at the change of plea hearing were that she was "satisfied with his advice and representation," and felt he was "a good lawyer." (*Id.*, D.E. 79 at PageID 230.) She also made the unsolicited statements at sentencing that she "want[ed] to thank Mr. Thomas," and that he was "an excellent attorney." (*Id.*, D.E. 80 at PageID 331.)

And even assuming that counsel told Petitioner that she would receive a lenient sentence,[12] the Court cured any misunderstanding by explaining to her the potential penalty and "by making it clear the Court, not the parties, would determine h[er] sentence." *Garnica v. United States*, 361 F. Supp. 2d 724, 737 (E.D. Tenn. 2005); *see also Cadavid-Yepes v. United States*, 635 F. App'x 291, 299-300 (6th Cir. 2016) ("proper plea colloquy cure[d]" counsel's alleged promise that petitioner would receive a "time served" sentence).

Finally, the Court finds that counsel adequately discussed with Petitioner the plea agreement's terms, including the appeal waiver. Counsel credibly testified that he reviewed the plea agreement with her a day or two prior to the change of plea hearing and explained to her the document's terms and the rights she was forfeiting.

For these reasons, the Court finds that Petitioner's decision to plead guilty was not the result of the ineffective assistance of counsel. Instead, Petitioner freely pleaded guilty to the sole count of the indictment; fully understood what rights she was forfeiting, including her appeal rights; knew that the Government was not bound to move for a downward departure for substantial

---

[12] Counsel states that two months prior to the change of plea hearing, he "explained to [Petitioner] that she was potentially facing a significant amount of time given the nature of the charge and the drug amounts involved." (D.E. 27-1 at PageID 376.)

assistance; and further understood that the Court would make the final decision as to the appropriate sentence. She is disappointed that the Court did not vary downward from the Guidelines range to a greater extent than it did, and perhaps regrets her decision not to accept the Government's offer to recommend an eighty-five-month sentence. Nevertheless, at the time she entered her guilty plea and waived her appeal rights, she did so knowingly, voluntarily, and intelligently.

B. Duty to Consult

Petitioner has not argued that a duty to consult arose because "a rational defendant would [have] want[ed] to appeal." *Lovell*, 83 F. App'x at 758. Instead, she insists that she "reasonably demonstrated to counsel that [s]he was interested in appealing." *Id.* For the following reasons, the Court finds that the argument is unsupported.

The record shows that Stoltz sought an end to the judicial proceedings in her case. As the Court has found, she knowingly and voluntarily entered into a plea agreement with the Government, pleaded guilty to the sole count of the indictment, and waived her appeal rights, except in narrow circumstances. *See e.g. United States v. Washington,* No. 2:11–CR–20248, 2013 WL 8178395, at *11 (E.D. Mich. Sept.5, 2013) report and recommendation adopted, No. 10-20202, 2014 WL 1304315 (E.D. Mich. Mar. 31, 2014) (finding that counsel was not ineffective for failing to consult with defendant regarding an appeal where, among other things, the plea agreement contained an appeal waiver and the agreement was explained at the plea colloquy).

Furthermore, her interactions with counsel during the nearly five months between the change of plea hearing and the sentencing hearing did not signal to counsel a change in her wishes. Counsel affirmed at the § 2255 hearing that, during that time period, Stoltz never "express[ed] to [him] any concern with her ability or right to appeal her sentence." (D.E. 77 at PageID 586.) He

testified that, "based on [his] conversations [with Petitioner] and what have you leading up to the sentencing hearing or during the course of the representation," he "had no cause to see or talk to [her]" about an appeal after sentencing. (*Id.* at PageID 592-93.)

And although Stoltz is unhappy that she did not receive a greater downward departure from the Guidelines range, she was not deprived of a bargained-for sentence. The plea agreement did not promise a particular sentence, unambiguously reserved to the Government the discretion to move for a downward departure for substantial assistance, and expressly stated that "[t]here [were] no other agreements between and among the parties." (No. 1:15-10013-JDB-1, D.E. 54 at PageID 129.) *See e.g.*, *Garner v. United States*, No. 13-CR-20120, 2015 WL 927251, at *6 (E.D. Mich. Feb. 11, 2015), *report and recommendation adopted in part, rejected in part on other grounds*, No. 13-CR-20120, 2015 WL 927104 (E.D. Mich. Mar. 4, 2015) (petitioner "did not reasonably demonstrate an interest in appealing" where, among other things, he "received the benefit of the bargain as to his sentence").

Finally, the communications that Petitioner and her parents had with counsel in the weeks and months following sentencing do not show that she expressed an interest in appealing. Stoltz testified that she "had [her] father call" counsel in the days following sentencing because, "among other things, [she] intend[ed] to talk to [him] about the viability of an appeal." (D.E. 77 at PageID 558.) She affirmed that "had [counsel] been with [her] the following day after [her] sentencing" she "would have told him [that she] want[ed] to appeal." (*Id.*, at PageID 580.) She explained that she "never got a chance" to talk to counsel about an appeal because she "left to go to prison [on] April 22nd, 2016," and "arrived in Tallahassee, Florida May 3rd, 2016." (*Id.* at PageID 558.) She wrote letters to counsel from Florida, which "he didn't answer." (*Id.*) She eventually "wrote [a

letter] to [the] state bar" about her frustrations, which "got transferred to the Board of Professional Responsibility." (*Id.* at PageID 559.)

Petitioner admitted on cross-examination that she was not transferred out of Tennessee until six weeks after sentencing—nearly a month after the time to appeal had expired. (*Id.* at PageID 559-60.) In addition, her testimony that she directed her father to contact counsel about the viability of an appeal is contradicted by her father's testimony. Travis Smith testified that, in the courthouse immediately after sentencing, he "asked Mr. Thomas if he would talk." (*Id.* at PageID 597.) Counsel "said, sorry about the case," then "left [and] went across the street." (*Id.*) Smith called counsel on the Monday following the sentencing hearing, and also "three or four times" thereafter, and stopped by his office one time. (*Id.* at PageID 597-60.) He stated that he had "wanted to know if [counsel] knew . . . where [his] daughter would be or—[he] wanted to talk to him about the sentencing." (*Id.* at PageID 597.) "As far as talking to him about appeal, at that particular time [he] didn't have any idea about it." (*Id.*) On cross examination, Smith stated that only after Petitioner was transferred to Florida did he "really, really th[ink] that she might get to appeal." (*Id.* at PageID 604.) He was asked: "Now, those handful of times, three or four or five, that you tried to call Mr. Thomas' office, and then the one time . . . you tried to stop by after the sentencing hearing, were you doing that, or was your daughter directing you to do that?" (*Id.*) Smith answered: "I was doing that. I was concerned, yes, sir." (*Id.*)

Counsel's testimony confirms that Petitioner did not express to him an interest in appealing, whether directly or through her family. Counsel stated that Petitioner's "family did contact [him], but it was never about an appeal." (*Id.* at PageID 588.) He was "not certain how soon or how far after th[e] sentencing hearing it would have been," but those contacts were "related to documents from the file." (*Id.* at PageID 590.) He stated that he was "almost certain [he] talked

to the family." (*Id.* at PageID 593.)  He could not "remember the timeframe . . . [b]ut again, it was nothing about an appeal." (*Id.*)  Counsel also explained that Petitioner sent him three letters, but noted that all of them were dated and received more than two months after the sentencing hearing. (*Id.* at PageID 288-89.)  In those letters, Petitioner only asked him to "provide[] an affidavit with regards to some conversations [he] had with particular law enforcement officers," and also copies of documents from her case file.  (*Id.* at PageID 588.)

The letters confirm counsel's testimony that the inmate and her parents were seeking counsel's assistance in providing supporting documentation for the preparation of her Petition, and not regarding an appeal.  (*See e.g.*, D.E. 2-2 at PageID 95.)  Stoltz asked counsel to provide a statement or affidavit regarding "the specifics of [his] meeting with" Agent Jackson, a "copy of [the] statement [she] read" at sentencing, and copies of other documents from her case file.  (D.E. 2-2 at PageID 99.)  In her June 16, 2016, letter, she told counsel,

> My parents have been trying to get in touch with you for several weeks now.  My Dad has spoken to the secretary about obtaining copies of my file including the audio taped interview with DTF officer Chad Jackson that occurred in September of 2015.  I plan on using the audio as evidence in several points that I am bringing to the Court's attention concerning my innocence.  I have written you two letters myself that were post-marked May 20, 2016, and June 6, 2016, concerning the same issues of obtaining these materials.

(D.E. 2-2 at PageID 95.)  Petitioner's grievance to the Board of Professional Responsibility pertained to counsel's limited response to her requests for his affidavit and the case file (D.E. 2-2 at PageID 98), and it confirmed that her father's contacts with counsel's office related to that issue (*id.* ("[M]y parents . . . have contacted [counsel's] office in attempts to obtain copies of my file concerning my case.").) [13]

---

[13] On June 29, 2016, Counsel provided Petitioner with copies of documents from her case file.  (*See* D.E. 2-2 at PageID 103).

On this record, the Court finds that Petitioner did not reasonably demonstrate to counsel that she was interested in appealing. As no duty to consult arose, counsel's performance was not deficient.

Even if counsel should have consulted with Stoltz about an appeal following sentencing, Stoltz has not shown a reasonable probability that, but for counsel's failure to consult, she would have appealed. Although she testified to the contrary at the § 2255 hearing, she did not exhibit a desire to appeal her sentence in the weeks following its imposition. She also has not argued that there exist non-frivolous grounds for appeal, and the Court has not found any. Claim 5 is therefore DENIED.

## II. Claim 1: Counsel's Decision Not to Challenge the Inculpatory Statements

Petitioner asserts that counsel rendered ineffective assistance by failing to move to suppress the inculpatory statements attributed to her by Stewart in his complaint affidavit on the ground that the statements were obtained in violation of *Miranda v. Arizona,* 384 U.S. 436 (1966). (D.E. 1 at PageID 4-5.) She also argues that counsel should have challenged the statements as false. [14] (*Id.*) She alleges that she did not confess to having bought one-pound of methamphetamine from Individual 1, or having made ounce-sized purchases from Individual 2. (*Id.* at PageID 5.) She states that her comments at the February 2015 meeting about those purchases were in reference to the illegal activities of a woman she knows. (*Id.*) Respondent argues that a suppression motion

---

[14] The Court has found, based on Petitioner's own testimony at the change of plea hearing and her testimony at the § 2255 hearing, that she was not coerced into pleading guilty, but knowingly and voluntarily did so. To the extent that Claim 1, as set forth in the Petition, alleges that counsel's failure to challenge the inculpatory statements "coerced" her into pleading guilty (D.E. 1 at PageID 4), the Court finds that the claim is not supported by her testimonies. The Court will, nevertheless, address whether counsel's failure to file a motion to suppress or challenge the veracity of the inculpatory statements was otherwise ineffective assistance.

under *Miranda* would have been futile since the statements were voluntarily made. (D.E. 27 at PageID 366-67.) The Government does not address counsel's efforts to challenge the statements as untrue. [15]

"It is well-settled that claims about the deprivation of constitutional rights that occur before the entry of a guilty or no contest plea are foreclosed by the plea." *Cunningham v. Winn*, No. 15-CV-13049, 2017 WL 1245108, at *5 (E.D. Mich. Apr. 5, 2017) (citing *United States v. Broce*, 488 U.S. 563, 569 (1989); *Tollett v. Henderson*, 411 U.S. 258, 267 (1973)). *See also United States v. Stiger*, 20 F. App'x 307, 308 (6th Cir. 2001) (defendant's claim that "counsel and the government coerced him into pleading guilty" was "belied by the record," and, therefore, his guilty plea waived his claims that "counsel rendered ineffective assistance by failing to investigate and by failing to challenge the validity of the search [and] by not moving to dismiss the indictment") "When a criminal defendant has solemnly admitted in open court that [s]he is in fact guilty of the offense with which [s]he is charged, [s]he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett*, 411 U.S. at 267. Among the constitutional defects that may be forfeited is a challenge to trial counsel's failure to request a suppression hearing. *Id.* (citing *Stiger*, 20 F. App'x at 308-09; *see also White v. Skipper*, No. 1:18-CV-384, 2018 WL 1989982, at *7 (W.D. Mich. Apr. 27, 2018), *appeal dismissed sub nom. White v. Lindsey*, No. 18-1696, 2018 WL 6720013 (6th Cir. Aug. 6, 2018) ("Petitioner's guilty plea foreclosed any claim that his attorney was ineffective in failing to move to suppress evidence.").

---

[15] As noted in the Background section, *supra*, Petitioner's first defense attorney requested and received a probable cause hearing before Magistrate Judge Bryant. (*See* No.1:15-cr-10013-JDB-1, D.E. 4.) The inmate has not alleged that her first attorney was ineffective in any respects.

This Court has found that Petitioner's guilty plea was knowing and voluntary. Claim 1 alleges the deprivation of Petitioner's Sixth Amendment right to counsel regarding events that occurred prior to her guilty plea. The claim is therefore not cognizable in this collateral review proceeding.

Even if the claim were properly before the Court, however, Petitioner has not shown that counsel provided ineffective assistance. The "[f]ailure of counsel to file a meritorious motion to suppress may be ineffective assistance, . . . but is not ineffective assistance per se." *Porter v. United States*, No. 3:16-CR-22, 2019 WL 2505037, at *3 (E.D. Tenn. June 17, 2019) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 382-84) (1986)). To establish that her attorney was ineffective, a petitioner must not only show that counsel's failure amounted to deficient performance, she "must also prove that h[er] [constitutional] claim is meritorious." *Kimmelman*, 477 U.S. at 375. The United States Supreme Court has held that the Fifth Amendment prohibits a state from using a defendant's statements made during custodial interrogation, unless it shows that it advised the defendant, prior to questioning, that she "has the right to remain silent, that any statement [s]he does make may be used as evidence against h[er], and that [she] has the right to the presence of an attorney." *Miranda*, 384 U.S. at 444.

With regard to Stoltz's assertion that she should have been read her *Miranda* rights, she has failed to establish that a motion to suppress on that ground would not have been futile. *See United States v. Hanley*, 906 F.2d 1116, 1121 (6th Cir. 1990) (failure to file a futile motion to suppress does not constitute ineffective assistance). Petitioner's own submissions in this case belie her allegation that she was in custody during the February 2015 meeting. She describes having made a voluntary decision to attend the meeting in order to offer assistance in exchange for having the state charges against her dropped. (D.E. 1-1 at PageID 26 (stating that

she decided to attend the meeting in order to do "the next right thing" by choosing "to become a snitch," that "there was no[] going back," and that "she was determined that these officers would like her and accept her so that her pending charges would indeed get dismissed.").) She was not in the dark about why she was called to attend the meeting, and she does not allege that any of the law enforcement officers told her she could not leave. She confirms that she used the meeting as an opportunity to negotiate for the release of her boyfriend from jail. (D.E. 28 at PageID 383.) She claims that Blurton was her only ride home in inclement weather (D.E. 1 at PageID 6), but she does not indicate that she was unable to leave the meeting room voluntarily.

The voluntary nature of the February 2015 meeting is supported by the sentencing hearing testimonies of law enforcement officers who attended the meeting. When asked what the purpose of the meeting was, Blurton explained, "We were speaking with Ms. Tonya in reference to working hopefully some future cases with her and obtaining some other drugs from other offenders." (No. 1:15-cr-10013, D.E. 80 at 275). Jackson testified that the meeting took place at "approximately anywhere from 8:00 to 10:00" in the morning, and lasted "[i]n the hour, hour and a half range." (*Id.*, D.E. 80 at PageID 282, 284.) He explained that the "[p]urpose of the meeting was to interview Ms. Stoltz to gather information on an ongoing investigation possibly that could help us along with DEA on any further cases." (*Id.*, D.E. 80 at PageID 282.) Stewart testified that "the intent of the whole meeting" was for Petitioner "to potentially assist law enforcement." (*Id.*, at PageID 307-08.) He further stated that she was not "under arrest" and "c[a]me in on her own free will." (*Id.*, D.E. 80 at PageID 307.)

Counsel's averments are consistent with the sentencing hearing testimonies. He states in his affidavit that "at no time did [Stoltz] ever relay to [him] that she was speaking to law enforcement against her will." (D.E. 27-1 at PageID 375.) He explains that, "[i]n fact, all of the

evidence that [he] was able to uncover during the course of [his] representation points to the fact that [she] voluntarily met with law enforcement on February 20, 2015, in order to facilitate a deal that would allow her boyfriend to be released from jail." (*Id.*)

Petitioner's second assertion—*i.e.*, that counsel was ineffective for failing to challenge the truthfulness of the inculpatory statements—is belied by the record. The prosecution's summary of the offense conduct at the change of plea hearing included the following:

> MR. WILSON: . . . On February 20th, 2015, agents with the DEA and the drug task force interviewed the defendant. The defendant stated that in approximately September of 2014 she had purchased 1 pound of methamphetamine from an individual . . . for $12,000.
>
> She stated that the methamphetamine was sold or she sold the methamphetamine to another individual . . . for $20,000.
>
> She then stated that in March of 2014 she began purchasing ounce quantities of methamphetamine from an[other] individual . . . and purchased approximately 10 times.

(No. 1:15-cr-10013-JDB-1, D.E. 79 at PageID 249.) The Court asked Stoltz, "[I]s the information provided by government's representative regarding your involvement in this matter, is that basically correct?" (*Id.*, D.E. 79 at PageID 250.) She answered, "The statement is correct." (*Id.*) During her statement to the Court at sentencing, she described her efforts at the February 2015 meeting to assist law enforcement, stating "I answered Charles Stewart's [questions] truthfully and completely." (No. 1:15-cr-10013-JDB-1, D.E. 80 at PageID 325.) She did not mention, or raise any concern, that Stewart had wrongly attributed to her the inculpatory statements.

Even apart from her change of plea testimony and statements at sentencing, the record does not support her charge that counsel rendered ineffective assistance. Counsel acknowledges that Stoltz told him that she did not make the inculpatory statements, but states that he made a strategic decision, after consultation with her, to "rely on her assistance rather than challenging the statement in hopes of receiving a lesser sentence." (D.E. 27-1 at PageID 376.) He further states

that "everyone [he] spoke with in connection with this case affirmed that the statement was properly attributed to Ms. Stoltz and was a correct summary of every detail and admission that was made by her to authorities at said meeting." (D.E. 27-1 at PageID 375.) Petitioner concedes that state law enforcement officers Blurton and Jackson were among the individuals whom counsel interviewed. (D.E. 1 at 5.) Those officers were participants in the February 2015 meeting.

Petitioner nevertheless insists that Jackson left the meeting room at the point at which she discussed the one-pound of methamphetamine, and thus, could not have provided information to counsel about whether she incriminated herself. (D.E. 28 at PageID 383.) She admits, however, that Jackson was in the room for the discussion of the ounce-sized acquisitions of methamphetamine from Individual 2 (D.E. 28 at PageID 383), and she does not allege that Blurton was gone at any point during the meeting.[16] Jackson, moreover, confirmed under oath at the sentencing hearing that Stoltz incriminated herself at the meeting. (No. 1:15-cr-10013-JDB-1, D.E. 80 at PageID 384.)

Petitioner also maintains that counsel could have challenged the inculpatory statements had he subpoenaed certain interview tapes. (D.E. 1 at PageID 5; D.E. 28 at PageID 378.) At the § 2255 hearing, appointed counsel explained that there was "an audio recording, that we now understand is no longer available, [that] was made of [the] February 20th meeting and another meeting [with state law enforcement officers] in December of the previous year. Both of those records are not available." (D.E. 77 at PageID 546.) The Government's attorney stated that he did not know anything about such tapes. (*Id.* at PageID 546-47.) As there is no dispute that the tapes are not now available, the Court cannot determine whether they would have supported

---

[16] Petitioner admits that she told the officers at the meeting she had "gotten meth" from Individual 2 on several occasions, but denies that she confessed to "purchas[ing]" the drug. (D.E. 1-1 at PageID 28.)

Petitioner's allegation that she did not make the inculpatory statements attributed to her by Agent Stewart.

Counsel's decision to forego a challenge to the confessions, either under *Miranda* or based on their alleged falsity, did not constitute ineffective assistance for an additional reason. As Stewart testified at the sentencing hearing, Investigator Christi Foster from the Madison County Sheriff's Department provided independent information from an informant that Petitioner had travelled to Mississippi in early March 2015 to buy drugs. [17] Nearly seven grams of methamphetamine were discovered during a state probation home check on March 3, 2015, albeit with other state and federal law enforcement officers present.[18] The drugs were, therefore,

---

[17] Petitioner maintains that Stewart falsely testified, at both the sentencing hearing and the probable cause hearing, that Foster relayed the informant's information to him. In support, she alleges that, "[i]n Sgt. King's notes dated July 10, 2015, there is a notation that Charles Stewart lied on the stand [at the probable cause hearing] about King and Foster and their knowledge concerning [her] arrest before March 3, 2015." (D.E. 1-2 at PageID 40.) The notes, which she submitted as an exhibit (see D.E. 2-1 at PageID 81), are not authenticated. But even if they were, there is nothing to suggest that the notation "Charles Stewart lied on the stand about Sgt. King and Kristie Foster" is anything more than an entry by King about what Stoltz said to him during the interview.

[18] Petitioner insists that she was authorized by "Jackson, [her] handler" to possess the drugs. (D.E. 2-5 at PageID 162.) She avers that she "retrieved a 7 gram sample of crystal methamphetamine . . . that was to be turned over to [him]" to be used in a controlled buy. (*Id.*) In an effort to exclude the drug amount from the calculation of her offense level, counsel litigated at sentencing the issue of whether Stoltz possessed the 6.9 grams of methamphetamine at the direction of law enforcement. During the hearing, counsel examined Jackson regarding the issue. Jackson testified that he knew nothing about the 6.9 grams of methamphetamine, and did not authorize Stoltz to acquire it. (No. 1:15-cr-10013, D.E. 80 at PageID 287-88.) For her part, Petitioner does not allege that the so-called retrieval was paid for, recorded, or monitored by Jackson at the time it occurred.

Her allegation that Jackson directed her to acquire the drugs is also not supported by documents she has submitted as exhibits. The transcript of her cell phone texts from March 3, 2015, which were produced in discovery in her criminal case, reflect that she was, at that time, arranging a sale and purchase of methamphetamine, but they do not show that Jackson authorized her to acquire a sample of the drugs. (D.E. 2-6 at PageID 185-87.) She also alleges that text messages between her and Jackson would have established that she acquired the drug at his direction, but maintains that counsel never sought to secure a transcript of those texts. (D.E. 77 at

discovered through information that was independent of the inculpatory statements. That fact weighs in favor of counsel's decision, made in consultation with Petitioner, to proceed with plea negotiations and argue his client's substantial assistance at sentencing. The decision to plead early also secured for Petitioner a one-point reduction in offense level for acceptance of responsibility. Petitioner has thus failed to "overcome the presumption that, under the circumstances," counsel's decision to forego a challenge to the inculpatory statements "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks and citation omitted).

For these reasons, Claim 1 is DISMISSED as a non-cognizable pre-plea claim, and is otherwise without merit.

III.    Claim 2: Conflict of Interest

Petitioner asserts that counsel rendered ineffective assistance based on a conflict of interest. (D.E. 1 at PageID 8.) Specifically, she complains that counsel had previously represented one of the individuals about whom she provided information to law enforcement. (*Id.*) The claim is without merit.

A criminal defendant "has a Sixth Amendment right to conflict-free representation by counsel." *Gillard v. Mitchell*, 445 F.3d 883, 890 (6th Cir. 2006) (citing *Smith v. Anderson*, 689

PageID 545.) Although she was a party to those texts, she does not allege what specific statements Jackson made to her that would show that he authorized her to acquire the methamphetamine without his assistance. Even her Declaration of Facts, which contains specific allegations regarding her communications with Jackson in the days preceding her arrest, does not reveal that Jackson told her to acquire a drug sample prior to the controlled buy. (*See* D.E. 1-1 at PageID 29-31.) Petitioner also relies on the transcript of texts between her and Stewart, as set forth in Stewart's investigation report. (*See* D.E. 2-4 at PageID 125-29.) The report, which was produced in discovery in her criminal case, shows that she was pressing to be involved in controlled purchases of drugs in order to help secure her boyfriend's release from jail. (*Id.*) Stewart warned her "[d]on't buy or do anything without [C]had [Jackson] around." (*See* D.E. 2-4 at PageID 127.) The texts show that she was working with Jackson, but do not suggest that she acquired the methamphetamine at the direction of Jackson or any other law enforcement officer.

F.2d 59, 62–63 (6th Cir. 1982)). "To establish a violation of that right, a defendant must show that counsel had an actual conflict of interest." *Clemons v. United States*, No. 2:11-CV-03140, 2017 WL 1030725, at *10 (W.D. Tenn. Mar. 15, 2017) (citing *Gillard*, 445 F.3d at 890)). An "actual conflict" arises where a conflict "adversely affects counsel's performance." *Gillard*, 445 F.3d at 890 (quoting *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002)). "[I]f the conflict is as to a matter that is irrelevant or the conflict is merely hypothetical, there is no constitutional violation." *Moss v. United States*, 323 F.3d 445, 463–64 (6th Cir. 2003) (citing cases).

Counsel avers in his affidavit that, at his first meeting with Stoltz, he discussed the fact that he had represented the other individual in an unrelated federal case "in connection with a supervised release violation. . . . in 2012." (D.E. 27-1 at PageID 376.) He states that, "[a]fter receiving and reviewing the information Ms. Stoltz had provided to law enforcement and the Rules of Professional Responsibility, [he] determined that neither representation would adversely affect the other, and [he] proceeded to represent Ms. Stoltz." (Id.) He avers that "[a]t no time did [she] ever question whether there was a conflict, until the filing of the . . . [P]etition." (*Id.*)

Petitioner has not shown that counsel was laboring under an actual conflict of interest. For one thing, she does nothing more than broadly allege the existence of a conflict. The conflict is, therefore, merely hypothetical. Furthermore, she does not explain how counsel's previous representation influenced or adversely affected the choices or actions he took in her case. As Petitioner has failed to establish that counsel rendered ineffective assistance, Claim 2 is DENIED.

IV.     Claims 3 and 4: Counsel's Advocacy at Sentencing

Petitioner asserts in Claim 3 that counsel provided ineffective assistance "when he failed to present oral arguments at sentencing without proper citation to authority." (D.E. 1 at PageID 11.) She alleges that counsel did not "have case studies asked for by the court to establish

precedent in like cases." (*Id.*) She asserts in Claim 4 that counsel "failed to argue that the 5K1.1 motion is meant to consider all the assistance given by petitioner before sentencing for a downward departure." (*Id.*) She "disputes . . . the court's refusal to depart downward under U.S.S.G. § 5K1.1," blaming counsel for failing to show that her assistance "led directly to the apprehension of twenty-three persons and twenty-four arrests." (D.E. 1-2 at PageID 50). She maintains that "counsel should have challenged [her] sentence on the theory that the government [was] unwilling[] to acknowledge her substantial assistance." (*Id.* at PageID 51.) The claims are without merit.

As previously discussed, counsel called three law enforcement officers to testify as to Stoltz's assistance. The witnesses acknowledged that she provided information, including over ninety names of individuals involved in drug trafficking in the region and information regarding homicide cases. They testified, however, that no prosecutions or arrests resulted from the information. Counsel nevertheless presented a three-pronged argument in support of his contention that Petitioner's assistance to law enforcement warranted a five- to ten-level reduction in offense level. He maintained that her assistance on a cold case homicide and the "sheer volume" of other information she provided was significant, that she placed herself at risk of harm by cooperating on the homicide case, and that she subjected herself to prosecution through information that led to her federal charge. (No. 1:15-cr-10013-JDB-1, D.E. 80 at PageID 320-21.) The Court asked counsel if he had "any law to th[e] effect" that the "characteristic and nature of the offense" under § 3553(a) may include the fact that "[t]he information [the Defendant] gave [to law enforcement] may have provided assistance to [them] to arrest [her]." (*Id.*, D.E. 80 at PageID 318-19.) Counsel stated that he could not cite to any authority. (*Id.*, D.E. 80 at PageID 319.)

Petitioner has not shown that counsel performed deficiently. His argument about the characteristics and nature of the offense may have been novel, but that does not make it unreasonable. In addition, the totality of counsel's arguments and efforts were, in fact, successful, as they secured for his client a thirty-month downward departure from the bottom of the Guidelines range.

Counsel's performance was also not deficient for his purported failure to submit evidence that Petitioner's cooperation "led directly" to the apprehension or arrest of numerous individuals. The inmate does not explain the basis for the allegation, such as by providing detail about when she learned of a clear link between her assistance and law enforcement's arrest and prosecution decisions, or how she came to be privy to their decision-making processes.

Petitioner's contention that counsel "should have challenged [her] sentence" on the ground that the prosecution refused "to acknowledge her substantial assistance," is likewise misplaced. Whether the Government moves for a sentence reduction based on substantial assistance is a matter reserved to the Government's discretion, subject only to constitutional limitations. *Wade v. United States,* 504 U.S. 181, 185–86 (1992); *United States v. Hawkins*, 274 F.3d 420, 426 (6th Cir. 2001) (per curiam). A district court has no authority to lower a sentence based on the defendant's assistance absent a motion by the government. *Wade*, 504 U.S. at 186. Accordingly, counsel was not deficient in failing to challenge the sentence due to the Government's decision to recommend only a one-level reduction for substantial assistance.

Even assuming, however, that counsel performed deficiently in the ways alleged, the Court would not likely have imposed a lower sentence. As the Court noted at the § 2255 hearing, "the fact [that Petitioner] did attempt to assist" was taken "into consideration" in the imposition of the below-Guidelines sentence. (D.E. 77 at PageID 555.) At bottom, counsel's efforts at sentencing

proved beneficial for his client, and Petitioner has not shown a reasonable probability that she would have received a lower sentence had he done more.

The Court therefore finds that counsel did not render ineffective assistance at sentencing. Claims 3 and 4 are DENIED.

For all of these reasons, the Petition is DENIED.

## APPEAL ISSUES

A § 2255 petitioner may not proceed on appeal unless a district or circuit judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2)-(3). A substantial showing is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "If the petition was denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Dufresne v. Palmer*, 876 F.3d 248, 252-53 (6th Cir. 2017) (per curiam) (quoting *Slack*, 529 U.S. at 484).

In this case, reasonable jurists would not debate the correctness of the Court's decision to deny the Petition. Because any appeal by Petitioner does not deserve attention, the Court DENIES a certificate of appealability.

Pursuant to Federal Rule of Appellate Procedure 24(a), a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App.

P. 24(a).  However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court.  *Id.*

In this case, for the same reason it denies a COA, the Court CERTIFIES, pursuant to Rule 24(a), that any appeal in this matter would not be taken in good faith.  Leave to appeal *in forma pauperis* is therefore DENIED.[19]

IT IS SO ORDERED this 16th day of August, 2019.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

[19] If Petitioner files a notice of appeal, he must also pay the full $505.00 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty days.